**UNITED STATES of America,**
**Appellant,**

v.

**John Q. WOOD et al., Appellees.**

**No. 19237.**

United States Court of Appeals
Fifth Circuit.

Oct. 27, 1961.

Rehearing Denied Nov. 30, 1961.

Burke Marshall, Asst. Atty. Gen., John Doar, First Asst. Atty., Civil Rights, Dept. of Justice, Washington, D. C., for appellant.

Edward L. Cates, Asst. Atty. Gen., Joe T. Patterson, Atty. Gen., Dugas Shands, Asst. Atty. Gen., for appellees.

Before RIVES, CAMERON and BROWN, Circuit Judges.

RIVES, Circuit Judge.

The United States appeals from the denial of a temporary restraining order pending a hearing for a preliminary injunction.[1] The Government seeks to restrain the defendants from prosecuting one John Hardy, a Negro, before a Justice of the Peace in Walthall County, Mississippi. The case was filed in the Southern District of Mississippi under the Civil Rights Act of 1957, 42 U.S.C.A. § 1971, on the theory that the continued prosecution of John Hardy was designed to, and would, intimidate the qualified Negroes of Walthall County from attempting to register to vote.[2] The defendants are John Q. Wood, Registrar of Walthall County; Edd Craft, Sheriff of Walthall County; Breed O. Mounger, City Attorney of Tylertown, county seat of Walthall; and Michael Carr, District Attorney of that judicial district of Mississippi. The suit was filed on September 20, 1961, just two days before the scheduled date of Hardy's trial, which was set for 9:00 a. m., September 22; service was made on the evening of September 20; the hearing on the temporary restraining order was set for September 21, when the Government submitted its case on affidavits. These affidavits were not disputed, the defendants claiming insufficient notice or time for obtaining counter-affidavits. At 5:00 p. m. on the 21st, the district court entered its decision denying the order. The district judge refused to sign a certificate under 28 U.S.C.A. § 1292(b) allowing the Government to seek appeal of an interlocutory order. On the evening of the 21st, an attorney for the Government, accompanied by a Mississippi Assistant Attorney General representing the defendants, flew to Montgomery, Alabama, to submit to Judge Rives a petition for stay of the state prosecution pending appeal of the district court's decision. There, decision on whether the stay should issue became unnecessary when the Mississippi Assistant Attorney General commendably agreed to continue the prosecution of Hardy pending disposition of the Government's appeal. Judge Rives then entered an order expediting the appeal and setting argument for 9:00 a. m., October 3, 1961. Over the Govern-

1. In the alternative, if the order is not appealable, the Government insists that this Court has jurisdiction of its petition for injunction under the all-writs statute, 28 U.S.C.A. § 1651.

2. The district court, in announcing the reasons for its decision, said: "We are not concerned in this hearing with anything outside the very sharp question as to whether or not that criminal proceeding should be enjoined." The complaint was framed in two counts, called "First Claim" and "Second Claim." The "First Claim" was limited to an attempt to enjoin the continued prosecution of John Hardy. The "Second Claim" charged a conspiracy to deprive Negro citizens of Walthall County, Mississippi, of the right secured by 42 U.S.C.A. § 1971(b), of which the prosecution of John Hardy was alleged to form a part, and prayed for very broad relief.

ment's objection, Judge Rives further ordered that the defendants, because of the minimum of time allowed them before the hearing in the district court, would be permitted to obtain counter-affidavits, provided they served them on the Government by September 29, and that the Government could then obtain rebuttal affidavits up until the argument on October 3. He stated that any such affidavits would be considered by this Court if that proved legally permissible.[3]

The facts as stated in the complaint and affidavits of the Government are as follows:

There are at the present time some 2,490 Negroes of voting age in Walthall County, Mississippi, none of whom are registered to vote. There are some 4,530 white persons of voting age in Walthall County, a substantial majority of whom are registered. In July 1961, John Hardy a Negro citizen, resident of Nashville, Tennessee, having completed two years at the Tennessee Agricultural and Industrial State College, came to Mississippi as a member of the "Student Non-Violent Coordinating Committee" for the purpose of encouraging Negroes to register and vote. This organization is currently sponsoring a voter registration project in Walthall, Amite, and Pike Counties, Mississippi. In early August, John Hardy and several other Negro students came to Walthall County to set up a voting registration school to teach the qualified local Negroes how to register and to encourage them to make application to the Voting Registrar. From August 18 to September 9, they conducted classes for several hours a day. In these classes, Hardy and his helpers would issue facsimiles of the necessary registration forms and a copy of the Constitution of Mississippi. Those attending the classes would practice filling out the forms, copying sections of the Mississippi Constitution, and explaining their meaning. Attendance varied from 25 to 50 each evening.

The first attempt of participants in the school to register took place on August 30, when Hardy accompanied five Negroes to the Registrar's office, where at least two completed the registration forms. Outside the Registrar's office, Hardy encountered the Sheriff of Walthall County, Edd Craft (a defendant), in the company of the editor of the Tylertown Times. The Sheriff asked Hardy a number of questions about the registration school and whether he had a driver's license. The Sheriff soon left, but the editor of the Tylertown Times interviewed Hardy more extensively for an article which appeared on the front page of the Tylertown Times the next day. On September 5, 1961, three more Negroes went to register; on September 6, one Negro; on September 7, two Negroes. The incident giving rise to this action took place on September 7, and since then no Negroes have attempted to apply for registration in Walthall County.

On September 4, Mrs. Edith Simmons Peters, a Negro, aged 63, owner of an 80-acre farm in Walthall County, having had an eighth-grade education, attended her first registration class. On about the same day, Lucius Wilson, a Negro, aged 62, owner of a 70-acre farm in Walthall County, also started attendance. By September 6, they thought they were ready to apply and agreed to accompany Hardy to the Registrar's office the next morning. They arrived in Tylertown in Mrs. Pe-

3. Counter-affidavits have been attached to the brief for appellees. Those affidavits might properly be considered in connection with the alternative relief sought in this Court under the all-writs statute (see n. 1, supra). We are not, however, permitted to consider them if the appeal is allowed. Henneford v. Northern Pac. Ry. Co., 1938, 303 U.S. 17, 58 S. Ct. 415, 82 L.Ed. 619; Hovland v. Smith, 9 Cir., 1927, 22 F.2d 769; New Albany Waterworks v. Louisville Banking Co., 7 Cir., 1903, 122 F. 776; American Bemberg Corp. v. United States, 3 Cir., 1958, 253 F.2d 691; Seward v. South Florida Securities, 5 Cir., 1938, 96 F.2d 964; United States v. Sinor, 5 Cir., 1956, 238 F.2d 271; cf. Board of Supervisors of Louisiana State University and Agr. and Mechanical College St. U & A & M Col. v. Ludley, 5 Cir., 1958, 252 F.2d 372.

ters' pickup truck at about 9:30 on the morning of September 7 and went to the Registrar's office in the courthouse. The Registrar, John Q. Wood, a defendant, was in an inner office; Mrs. Peters and Wilson went in and Hardy remained just outside the door. When Registrar Wood looked up, Mrs. Peters told him that they desired to register. Wood then replied that, "I am not registering anyone now. You all have got me in court and I refuse to register anyone else until this court is cleared up." John Hardy heard this from his position outside the door of the office some 5 or 6 feet away and came in. According to the affidavits of the Government, Hardy had given Wood only his name when Wood got up and said, "I want to see you John." He then brushed past Hardy into the main room and from the drawer of a desk took out a revolver. Holding the gun down by his right side he pointed to the door going outside and said, "Do you see that door, John?" Hardy replied, "Yes." Wood told him, "You get out of it." Hardy said OK, and turned to go. Wood followed him, and just as Hardy got to the door, Wood struck him on the back of the head, saying, "Get out of here you damn son-of-a-bitch and don't come back in here." Mrs. Peters and Wilson rushed on out, held Hardy up, and helped him out of the building. Hardy went first to the newspaper office, where he told the editor what had happened. The editor instructed him to get medical attention. Meanwhile, Wilson went to get the pickup truck, and Mrs. Peters helped Hardy eventually to a little cafe. Wilson returned and they headed out to the street. When asked what he was going to do, Hardy then told several people that he had better find the sheriff. Going up the street, they met the sheriff and, according to the affidavit of Mrs. Peters,

"They met right where I was standing and the sheriff asked, 'What happened to you, boy.' John told the sheriff what had happened. The sheriff told him he didn't have no business in that courthouse. Wilson walked up at this time. The sheriff then said to John, 'If that boy (pointing to Wilson) wants to register he know (sic) how to go down to that courthouse and he don't need you to escort him. You didn't have a bit of business in the world down there. You is from Tennessee, you was in Tennessee and you ought to have stayed there.' The sheriff told him to 'Come on.' John asked him, 'Are you arresting me?' The sheriff said 'Yes.' John asked 'On what charges' and the sheriff said for disturbing the peace and bringing an uprising among the people. John said, 'Will you allow me to tell my side of the story.' The sheriff said, 'Don't give me none of your head boy, or I will beat you within an inch of your life.' After the sheriff took John, I went home."

At the Tylertown jail, Hardy was interviewed twice during the day of the 7th—first, by the defendants Sheriff Edd Craft and City Attorney Breed Mounger, and later by the same two plus defendant Michael Carr, the local District Attorney for the State of Mississippi. That evening, because the feeling about the incident was evidently running high in the community, Hardy was transferred by the defendants to the jail in Magnolia, Mississippi. Hardy was released on bond the next morning and his trial for disturbing the peace was set for the 22nd of September.

Hardy claims in his affidavit that, about the time the formal charge was entered, the District Attorney took him into a room "and several white people whom I can't identify told me that I was in a lot of trouble and that I was asking for a lot of trouble to come down there; that they had good Negroes here and that they treated their darkies good but that I was causing a lot of trouble. The Justice of the Peace was present but the sheriff was out." There are no allegations that Hardy was otherwise mistreated in any way during his confinement.

■ The appellees move this Court to dismiss the appeal, and, at the very out-

set, this Court is faced with the question of its jurisdiction. The appeal is from the denial of a temporary restraining order. The Government admits that ordinarily the denial of a temporary restraining order is not an interlocutory order refusing an injunction within the meaning of 28 U.S.C.A. § 1292(a), and is not otherwise appealable.[4] The Government claims that, under the special circumstances of this case, the denial of the temporary restraining order is in the nature of a final decision from which an appeal may be taken under 28 U.S.C.A. § 1291.

The substance of the Government's case under the "First Claim" of its complaint is that the prosecution of Hardy, regardless of outcome, will effectively intimidate Negroes in the exercise of their right to vote in violation of 42 U.S.C.A. § 1971. This, it insists, is a claim entitling it to injunctive relief. As a practical matter, the time between the arrest and prosecution of a person for breach of the peace is usually very short—in this case, 15 days. If the Government states a claim entitling it to injunctive relief, then the effect of denying the temporary restraining order is to moot its case. The denial of the restraining order is thus equivalent to the dismissal of the First Claim of the complaint on the ground that it does not state a claim upon which the requested injunctive relief can be granted. To then call this de facto dismissal a nonappealable interlocutory order is to preclude review altogether. As a practical matter, then, it is clear that the denial of the restraining order is a

final disposition of the Government's claimed right to prevent the prosecution of Hardy.[5] The question is whether such a practical construction may be put on the meaning of a final decision as used in § 1291.

It does not appear that the Supreme Court or any of the Circuits has directly considered whether the denial of a temporary restraining order may under certain circumstances be considered a final decision within the meaning of 28 U.S.C.A. § 1291. However, the Supreme Court has given a number of guides to be used for the construction of section 1291 and the meaning of "final" in cases concerning the appealability of orders deciding collateral issues, separable from the main claim. In Cohen v. Beneficial Indus. Loan Corp., 1949, 337 U.S. 541, 69 S.Ct. 1221, 1225, 93 L.Ed. 1528, it was said that the purpose of § 1291 is to "disallow appeal from any decision which is tentative, informal or incomplete," or from a consummated decision which is a mere step towards a final judgment with which it will merge. The Court found, however, that the collateral issue involved in that case was not of such a nature. "When that time comes [to appeal the final disposition of the case], it will be too late effectively to review the present order and the rights conferred by the statute, if it is applicable, will have been lost, probably irreparably." The Court then held the order to be appealable within the meaning of section 1291, and concluded, "This Court has long given this provision of the statute this practical rather than a technical construction." The rule

4. See Connell v. Dulien Steel Products, 5 Cir., 1957, 240 F.2d 414; St. Helen v. Wyman, 9 Cir., 1955, 222 F.2d 890; Mesabi Iron Co. v. Reserve Mining Co., 8 Cir., 1959, 270 F.2d 567; Pennsylvania Motor Truck Ass'n v. Port of Philadelphia Marine Terminal Ass'n, 3 Cir., 1960, 276 F.2d 931.

5. One of the questions posed by the appellees is how the denial of an order can be final when, admittedly, granting it would only be interlocutory and nonappealable. A very similar issue was presented in Swift & Co. Packers v. Com-

pania Colombiana Del Caribe, 1950, 339 U.S. 684, 70 S.Ct. 861, 94 L.Ed. 1206. There, the collateral order involved was the vacating of an attachment on a ship under an admiralty libel. The Court pointed out that only the vacating of the attachment would have the practical effect of finally and irreparably determining the rights of the appellant to the ship, and the denial of the motion to vacate would have been only interlocutory since the rights of all the parties could have been protected pending the final determination of the primary claim. 339 U.S. at page 689, 70 S.Ct. at page 865.

was later summarized by Mr. Justice Frankfurter in his concurring opinion in Sears, Roebuck & Co. v. Mackey, 1956, 351 U.S. 427, 441, 76 S.Ct. 895, 903, 100 L.Ed. 297:

> "Thus the Court has permitted appeal before completion of the whole litigation when failure to do so would preclude any effective review or would result in irreparable injury. See Forgay v. Conrad, 6 How. 201 [12 L.Ed. 404]; Cohen v. Beneficial [Indus.] Loan Corp., 337 U.S. 541, 545–547 [69 S.Ct. 1221, 93 L.Ed. 1528]; Swift & Co. [Packers] v. Compania [Colombiana Del] Caribe, 339 U.S. 684, 688–689 [70 S.Ct. 861, 94 L.Ed. 1206]."

On the basis of these cases, we feel that the Supreme Court has approved a practical construction of section 1291 and that an order, otherwise nonappealable, determining substantial rights of the parties which will be irreparably lost if review is delayed until final judgment may be appealed immediately under section 1291. We, therefore, determine the denial of the temporary restraining order to be a final decision, appealable under 28 U.S. C.A. § 1291.[6]

Turning to the merits of the appeal, the Government asks the court to enjoin a state criminal court proceeding. We are immediately met with the strictures of 28 U.S.C.A. § 2283 which provides:

> "A court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments."

It is the contention of the Government that this statute does not apply where the suit is brought by the United States.[7] This question was before the Supreme Court in the case of Leiter Minerals, Inc v. United States, 1957, 352 U.S. 220, 77 S.Ct. 287, 1 L.Ed.2d 267, where the United States brought suit in the federal court to protect its title to certain public lands. The issue of title was already before a state court for determination. The United States asked the Court to enjoin the state proceedings, which request was upheld on appeal. Mr. Justice Frankfurter, the architect of the strict interpretation of section 2283, and its predecessor in Toucey v. New York Life Ins. Co., 1941, 314 U.S. 118, 62 S.Ct. 139, 86 L.Ed. 100, and Amalgamated Clothing Workers v. Richman Bros., 1955, 348 U.S. 511, 75 S.Ct. 452, 99 L.Ed. 600, wrote for the Court, stating:

> "There is, however, a persuasive reason why the federal court's power to stay state court proceedings might have been restricted when a private party was seeking the stay but not when the United States was seeking similar relief. The statute is designed to prevent conflict between federal and state courts. This policy is much more compelling when it is the litigation of private parties which threatens to draw the two judicial systems into conflict than when it is the United States which seeks a stay to prevent threatened irreparable injury to a national interest. The frustration of superior federal interests that would ensue from precluding the Federal Government from obtaining a stay of state court proceedings except under the severe restrictions of 28 U.S.C. § 2283,

---

6. It is significant to note that Courts of Appeals have considered the merits of denials of temporary restraining orders in deportation cases, evidently on the theory that unless review is had the entire controversy would be mooted by the deportation of the appellant. See Shih v. Kennedy, No. 16272 (D.C.Cir., March 23, 1961); Marcello v. Brownell, No. 12838 (D.C.Cir., August 31, 1955).

7. The Government contends also that the Civil Rights Act of 1957, in effect, expressly authorized the stay of the proceedings in the State court, and further that such stay was necessary in aid of the jurisdiction of the federal court. We find it unnecessary to decide those questions.

would be so great that we cannot reasonably impute such a purpose to Congress from the general language of 28 U.S.C. § 2283 * * *." 352 U.S. at pages 225, 226, 77 S.Ct. at page 290.

The Court then expressly construed section 2283 as inapplicable to a suit brought by the United States.

■ The appellant attempts to distinguish the Leiter Minerals case on the ground that the Court there dealt with the protection of federal property rights and the enjoining of state civil proceedings, and here the United States sues on behalf of a class of private citizens and seeks to enjoin state criminal proceedings. As far as the type of proceeding is concerned, the statute must be read as applicable to all state proceedings. Admittedly, the policy against interference with state criminal proceedings is stronger than that with respect to state civil proceedings,[8] but this policy is not one of statutory derivation. It applies even where section 2283 does not. Thus, the type of state court proceeding may not be used as a ground for distinguishing the Leiter Minerals construction of section 2283. It is also difficult to see how the nature of the interests the United States asserts can make a difference so long as the United States asserts them. The method of construction used in Leiter Minerals is that the statute will not be imputed to apply to the United States in the absence of some congressional indication to the contrary. We are unaware that Congress even considered the applicability of section 2283 to the United States, much less that it distinguished between the type of rights the United States may happen to assert.

■ Following further, however, the appellees' contention, they claim that the rights the United States asserts here are private rights such that applying section 2283 could not lead to the "frustration of superior federal interest" within the meaning of Leiter Minerals. In fact,

they further contend that the lack of a federal interest precludes the Attorney General from bringing the suit under any circumstances. We are unable to agree. In United States v. Raines, 1960, 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed.2d 524, the Supreme Court said with respect to a claim based on the same Civil Rights Act as this case, 42 U.S.C.A. § 1971:

"It is urged that it is beyond the power of Congress to authorize the United States to bring this action in support of private constitutional rights. But there is the highest public interest in the due observance of all the constitutional guarantees, including those that bear the most directly on private rights, and we think it perfectly competent for Congress to authorize the United States to be the guardian of that public interest in a suit for injunctive relief." 362 U.S. at page 27, 80 S.Ct. at page 526.

Thus, whatever doubt there may have been as to the right of the United States to bring the suit or as to the extent of the federal interest involved has been put to rest.

The determination that section 2283 is inapplicable to the present suit does not, however, dispose of this appeal. For, as the Court went on to say in the Leiter Minerals case, "The question still remains whether the granting of an injunction was proper in the circumstances of this case." 352 U.S. at page 226, 77 S.Ct. at page 291.

The district court in this case did not deny the restraining order on the ground that it had no jurisdiction or could not in a proper case enjoin a state criminal proceeding. Rather, it denied the motion on the ground that it was within its discretion to refuse to extend its equitable powers to interfere with a state criminal proceeding. It pointed out that, as to Hardy himself, the Government does not even contend that the state proceeding will result in irreparable injury to Hardy's constitutional rights. As

8. See Ex parte Young, 1908, 209 U.S. 123, 162, 28 S.Ct. 441, 52 L.Ed. 714; Beal v. Missouri Pacific RR Co., 1941, 312 U.S. 45, 50, 61 S.Ct. 418, 85 L.Ed. 577.

for the Government's contention that the prosecution will intimidate other Negroes in Walthall County and lead to the irreparable injury of their constitutional right to vote, which injury the United States may assert under section 1971 of the Civil Rights Act, Judge Cox states:

"In the argument it is asserted that the trial of that case tomorrow will irreparably damage the United States in deterring colored people in Walthall County from registering. That statement is without any substantial support in the record before the Court and appears as a non sequitur.

\* \* \* \* \* \*

"It is difficult to find any satisfactory definition of irreparable, but it is equally difficult to conceive how the United States can possibly be irreparably damaged by this criminal case down in Walthall County, Mississippi, regardless of its outcome."

He then goes on to base his decision on the holding of the Supreme Court in Douglas v. City of Jeannette, 1943, 319 U.S. 157, 163, 63 S.Ct. 877, 881, 87 L.Ed. 1324, where it said:

"It is a familiar rule that courts of equity do not ordinarily restrain criminal prosecutions. No person is immune from prosecution in good faith for his alleged criminal acts. Its imminence, even though alleged to be in violation of constitutional guaranties, is not a ground for equity relief since the lawfulness or constitutionality of the statute or ordinance on which the prosecution is based may be determined as readily in the criminal case as in a suit for an injunction."

This same rationale is the substance of the appellees' case on appeal.

It is necessary at this point to clearly state what right the Government claims, and the facts it believes sufficient to entitle it to injunctive relief.

The Civil Rights Act of 1957, 42 U.S.C.A. § 1971(b), provides: "No person, whether acting under color of law or otherwise, shall intimidate, threaten, coerce \* \* \* any other person for the purpose of interfering with the right of such other person to vote or to vote as he may choose \* \* \*." Section 1971(c) provides: "Whenever any person has engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice which would deprive any other person of any right or privilege secured by subsection \* \* \* (b), the Attorney General may institute for the United States \* \* \* a civil action \* \* \* for preventive relief, including an application for a permanent or temporary injunction \* \* \*." The Government states that under Mississippi law registration is prerequisite for voting in any election, such that intimidation to prevent registration is a primary means for preventing the Negro citizens of Mississippi from exercising their right to vote. The complaint sets out the acts of the defendants calculated to intimidate, which include: the Registrar striking Hardy with gun; Hardy's subsequent arrest for breach of the peace; the numerous comments indicating that the purpose of acts of the Registrar, the Sheriff and the other defendants are in part to punish Hardy for his registration activities; the interviews in jail with respect to these activities; the placing of charges known to be unjustified; and finally the scheduled prosecution for September 22. The crux of the action is then stated in paragraph XV of the complaint:

"The continued prosecution of and participation in the criminal proceedings by the defendants is without justification and was and is being continued solely to attempt to intimidate, threaten and coerce Negro citizens of Walthall County for the purpose of interfering with the right of such Negro citizens to register and vote \* \* \*."

In the affidavit supporting the request for an order restraining Hardy's prosecution, the Government alleges the belief of its counsel "that, unless restrained by this Court, the act of John Q. Wood in

physically striking a Negro citizen in the presence of other Negroes who were attempting to register, the act of Edd Craft in arresting and molesting a Negro citizen and the acts of all the defendants in continuing and participating in the prosecution of a Negro citizen who encouraged registration, have caused, and will continue to cause, irreparable injury, loss and damage to plaintiff, the United States of America, in that the inevitable effect of such acts on the part of defendants is to deter Negro citizens in Walthall County, Mississippi, who are eligible, from exercising their right to become registered voters and to vote for federal candidates." In the argument here, and in the court below, the Government makes very clear that the rights the Government asserts are not the rights of Hardy; it assumes that Hardy will obtain a fair trial and that the existence of adequate state remedies will protect all of Hardy's constitutional rights. Hardy is not qualified to register or vote in Walthall County and the Government does not seek to assert Hardy's rights under section 1971. Rather, the Government here asserts the rights of all those Negro citizens in Walthall County who are qualified to register and vote. The rights of these citizens are not at issue in Hardy's prosecution, and remedies available to Hardy in his trial are in no way available to them. Thus, if the prosecution of Hardy does injure them, they have no adequate relief in his trial.

The question then arises how the arrest and prosecution of Hardy can irreparably injure these other citizens, especially if we must assume that Hardy will receive a fair trial and that his acquittal is a possible result. It is the contention of the Government that, under the circumstances of this case, the alleged acts of unlawfully striking Hardy, arresting him without cause, and proceeding with his prosecution constitute sufficient facts to establish an equitable claim under the Civil Rights Act, even if Hardy were acquitted at the trial.[9]

█ The legislative history of section 1971 would indicate that Congress contemplated just such activity as is here alleged—where the state criminal processes are used as instruments for the deprivation of constitutional rights. The Attor-

**9.** The Government's brief sets out at length why these acts alone will cause such injury as to warrant injunctive relief.

"In spite of the fact that Negroes constitute a large percentage of the county's population, there are presently no Negro voters in Walthall County. John Hardy and others, members of the Student Non-Violent Coordinating Committee, came to Walthall County this summer to sponsor a voter registration drive. After the registration school was set up, eleven Negroes went to the registrar's office to seek to register for voting, on four different occasions, in spite of the fact that the registrar, under one pretext or another, simply refused to take any action. Since the incident of September 7, 1961, however, when John Hardy was struck by the registrar and then arrested, no Negroes have made any attempt to be registered. On the basis of the record in this Court and in view of the conditions and circumstances prevailing in Mississippi, it is most unlikely that, if the appellees are allowed to proceed with Mr. Hardy's trial, further Negro registration will take place. The blunt truth is that it can really not be expected that Negroes who have lived all their lives under the white supremacy conditions which exist in that area of Mississippi will continue their efforts to register and otherwise to exercise their rights and privileges of citizenship if in addition to being threatened and beaten, they will also be prosecuted in state court with all that such a prosecution entails. Such prosecutions, experience has shown, not only are expensive, but it is becoming increasingly difficult for Negroes accused of offenses in the civil rights context even to secure competent legal assistance. There are no Negro attorneys in Walthall County and scarcely a half-dozen Negro attorneys in the entire State of Mississippi. Because of the tremendous political and economic pressures brought to bear by the State of Mississippi, it is difficult, if not impossible, to secure competent white counsel for Negroes in cases such as this. Certainly this will be so if, upon success in this case, some officials of the State of Mississippi will be further emboldened to use harrassment by prosecution to an even greater extent than heretofore."

ney General testified before a Subcommittee of the House Judiciary Committee that the purpose of the Act was to supplement the criminal statutes already on the books. He stated that "with these new civil powers, we could reach only the same situations which are now susceptible to action under the Sections 242 and 241. But, of course, we think we could do it much more effectively through the use of civil proceedings" (sources: Gov.Br. p. 11). The advantage of civil proceedings is that they may be brought into play immediately to prevent the completion or continuation of a violation of the Act, while criminal proceedings are cumbersome and are invoked only after the violation is completed. It would appear that Congress already had before it the types of activities the criminal sections reached and could thus foresee the scope of the new civil powers. In Culp v. United States, 8 Cir., 1942, 131 F.2d 93, a criminal conviction under 18 U.S.C.A. § 242 was upheld where the defendants, sheriff, policeman, and magistrates, had instigated false charges, arrests and prosecutions in state courts for the purpose of extorting money from their victims. See also, Brown v. United States, 6 Cir., 1953, 204 F.2d 247, 249 (the criminal sections protect an individual from being "arrested by an officer acting arbitrarily without cause and for an ulterior purpose"). Similarly, in Screws v. United States, 1945, 325 U.S. 91, 126, 65 S.Ct. 1031, 1047, 89 L.Ed. 1495, Mr. Justice Rutledge, concurring, stated with respect to the criminal sections that they "have safeguarded many rights and privileges apart from political ones. Among those buttressed, either by direct application or through the general conspiracy statute * * * are the rights to a fair trial, including freedom from sham trials." Further, in the legislative history remarks of Southern Congressmen clearly indicate that they foresaw the intended reach of these civil sections and foresaw that injunctive proceedings in the federal court might supplant state court proceedings. We quote from the Government's brief:

"Thus, Senator Johnston of South Carolina, an opponent of the bill which became the Civil Rights Act stated that (103 Cong.Rec. 11342), 'We have complete flouting of state law, complete ouster of state jurisdiction, even where it may have attached in a criminal case.' Again he said (103 Cong.Rec. 11343) that the bill 'would give the Attorney General the right to take enforcement out of the hands of the states into his own hands, to take it away from state courts, and put it in federal courts.' Senator Stennis of Mississippi reiterated this thought. He indicated (Hearings Before the Subcommittee on Constitutional Rights of the Committee on the Judiciary, United States Senate, 85th Cong., 1st Sess., p. 94) that 'This proposed law clothes all these officials with complete power to bypass the state courts and state and federal administrative bodies. Now that is one of the most far-reaching provisions in this entire statute; is a complete bypassing of all state courts * * *.' "

Based on the allegations of the complaint, the supporting affidavits, the statutory language of section 1971(b–c), and its legislative history, we are convinced that the Government states a claim for which relief is warranted.

This brings us to the district court's reliance upon Douglas v. City of Jeannette, supra, for the points that injunctive relief was not available against a state court criminal action, and that the denial of the temporary restraining order was within the court's discretion.

For a number of reasons we cannot agree with the district court's conclusion or its reliance on Douglas v. City of Jeannette. First, this suit is brought by the United States under an obligation charged to it by the Civil Rights Act for the protection of constitutional rights in which, according to the Supreme Court in United States v. Raines, supra [362 U.S. 17, 80 S.Ct. 526], there is the "highest public interest." As was also pointed out

by the Supreme Court in the Leiter Minerals case, where the United States does seek to stay irreparable injury to a national interest, the normal equitable doctrines of comity between the court systems, doctrines which are the basis of the Douglas v. City of Jeannette rationale, have little or no bearing. Further, where the United States has instituted the suit, we must assume that the considered judgment of the Attorney General has concluded that a violation of a national interest has taken place, a judgment unbiased by the subjective opinion of the private individuals who have in fact been injured. This judgment should not be lightly put aside by the courts on a preliminary motion as in this case. Thus, the presence of the United States seriously tests the strictures of Douglas v. City of Jeannette.

Second, the court in this action is not operating under common-law equitable and discretionary doctrines, but under a mandatory jurisdictional statute. As already pointed out, the district court considered that it had jurisdiction over this action but that such jurisdiction should not be exercised to the extent of issuing the temporary restraining order. Under the applicable jurisdictional section, we do not believe the court had that choice. Section 1971(d) states:

> "The district courts of the United States shall have jurisdiction of proceedings instituted pursuant to this section and shall exercise the same without regard to whether the party aggrieved shall have exhausted any administrative or other remedies that may be provided by law."

Since the United States has, in our opinion, stated a valid claim under the section, we read this section as directing the district court to exercise its jurisdiction. It might be argued that this is not a direction to exercise "equitable" jurisdiction, but both the rationale of the section and the legislative history refute this interpretation. For having established a claim, the only "preventive relief" available to the United States is injunctive relief through the federal courts. If the United States may not act until after the process of intimidation is complete, the United States no longer has available a worthwhile civil remedy for preventive relief. And, as was pointed out by the Supreme Court in the Leiter Minerals case, the fact that the United States has no available remedy other than action through the federal courts weighs heavily towards the conclusion that the court must grant the relief to which it is entitled. As if to support this point, subsection (d) specifically states that other remedies available to the persons on whose behalf the United States sues may not be considered as grounds for denying relief to the Government. In addition, the legislative history of section 1971(d) indicates that when Congress said that the district courts "shall" exercise jurisdiction, it meant they shall exercise *equitable* jurisdiction. On the floor of the Senate, Senator Case of South Dakota offered an amendment to subsection (d) which would have substituted the term "may exercise" for "shall exercise." The purpose of this amendment, he explained, (103 Cong.Rec. 13451), was to "make actions of the court permissive * * * the court would be relieved from *the mandate that it must consider an injunction* regardless of the fact that there might be a simpler and better way to achieve the relief desired." (Emphasis added.) After strong objection to the amendment, it was defeated.

The mandatory duty of the district courts to exercise jurisdiction of proceedings under section 1971 does not, of course, indicate in any way whether such exercises shall culminate in granting or in denying the relief prayed, or in any relief. It does, however, include some opportunity for the hearing of the merits of a properly asserted claim, and precludes the district court from, in effect, dismissing the claim upon the hearing of a motion for a temporary restraining order.

Finally, there is in Douglas v. City of Jeannette considerable emphasis on the nature of the injury. The allegation in that case was that members of Jehovah's

Witnesses were being arrested and prosecuted under an unconstitutional ordinance because of the method of proselyting they were using in private homes. See 319 U.S. at page 166, 63 S.Ct. at page 881 (dissenting opinion of Mr. Justice Jackson). They also claimed that the city officials threatened to continue the arrests. The nature of the injury was that, in the absence of injunctive relief, the threatened arrests and prosecutions would deter Jehovah's Witnesses in the exercise of their constitutional rights. This is precisely the nature of the injury in this case, although the activity to be enjoined is different. Here, the Government claims that if Hardy's trial continues other Negroes in Walthall County will be afraid to apply for registration for fear they will be subjected to unjustified official acts, including arrest and prosecution. At this point, it should be noticed what the Supreme Court did in Douglas v. City of Jeannette. The import of the decision is not to deny as a question of fact that Jehovah's Witnesses were deterred in the exercise of their constitutional rights. Rather, it stated that, "No person is immune from prosecution in good faith for his alleged criminal acts. Its imminence, even though alleged to be in violation of constitutional guaranties, is not a ground for equity relief * * *," except in the rare instance where it can be shown that the irreparable injury is "both great and immediate." The effect of this is to say that even where an actual deterrent is found to exist by the trier of fact, it will not be judicially recognized to fulfill the equitable element of "irreparable injury." The primary reason given by the Court being one of comity—that interference with the state criminal system is not warranted when adequate safeguards exist in the state proceedings. For several reasons, we hold that this theory is not applicable to the present case.

■ First, section 1971 creates a cause of action in the United States for "preventive relief" where a person has intimidated or has attempted to intimidate another in the exercise of his right to vote.

Where a federal statute has specifically created a cause of action for preventive relief for intimidation, it may no longer be said that this intimidation will not be judicially recognized for the purpose of establishing an equitable cause of action.

■ Second, we believe that the affirmative defense of adequate state remedies has been specifically removed by statute, for subsection (d) expressly states that the district court is to exercise jurisdiction without regard to whether the aggrieved party shall have exhausted other remedies provided by law. With this defense removed, there are no longer any grounds for judicially ignoring that intimidation may exist in fact or that irreparable injury is not present.

Third, this interpretation of the statute is in line with the doctrine in other federal cases in this Circuit dealing with the deprivation of constutitional rights on the basis of race or color. In an action to enjoin the enforcement of a criminal segregation statute, this Court stated in Morrison v. Davis, 5 Cir., 1958, 252 F.2d 102, 103, certiorari denied, 1958, 356 U.S. 968, 78 S.Ct. 1008, 2 L.Ed.2d 1075:

"This is not such a case as requires the withholding of federal court action for reasons of comity, since for the protection of civil rights of the kind asserted Congress has created a separate and distinct federal cause of action. * * * Whatever may be the rule as to other threatened prosecutions, the Supreme Court in a case presenting an identical factual issue affirmed the judgment of the trial court in the Browder case [Browder v. Gayle, D.C.M.D.Ala., 142 F.Supp. 707, affirmed 1956, 352 U.S. 903, 77 S.Ct. 145, 1 L.Ed.2d 114] in which the same contention was advanced. To the extent that this is inconsistent with Douglas v. City of Jeannette, Pa., 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324 we must consider the earlier case modified."

The foundation of our form of government is the consent of the governed. Whenever any person interferes with the

right of any other person to vote or to vote as he may choose, he acts like a political termite to destroy a part of that foundation. A single termite or many termites may pass unnoticed, but each damages the foundation, and if that process is allowed to continue the whole structure may crumble and fall even before the occupants become aware of their peril. Eradication of political termites, or at least checking their activities, is necessary to prevent irreparable damage to our Government. On the other hand, the temporary postponement of trial of a misdemeanor case before a justice of the peace causes either no injury or very slight injury. The public interest demanded the granting of temporary relief by the district court.

Nothing said in this opinion is intended to pass upon, or intimate any views as to the merits of the claim asserted by the United States. The importance of the case is such as to require a full hearing, either upon the motion for a preliminary injunction or upon a final hearing, including an opportunity to examine and cross-examine the witnesses. The claim should not be allowed to become moot before some such hearing can be had. To that end, unless there is a further agreement to continue the prosecution of Hardy at least until determination of the motion for preliminary injunction, the district court should grant the Government's request for a temporary restraining order.

Reversed and remanded.

CAMERON, Circuit Judge (dissenting).

I respectfully dissent from the majority opinion in this case. The exigencies of time [1] arising from the desirability of returning to State hands the enforcement of its laws make it impossible for me to set down, point by point, the reasons for my dissent. This opinion will, therefore, be confined to a detailed discussion of one or two points whose decision seem to me so glaringly wrong in the majority opinion and so distressingly destructive of the cooperative relationship which should exist between state and federal sovereignties.

I do not think that the order by the district court denying the motion for a temporary restraining order was appealable, and I do not, therefore, think that the case decided by the majority was properly before us. The majority admits that the question has never been decided by the Supreme Court or any Court of Appeals, but accepts the government's argument that the denial of the temporary restraining order was a final decision because of the special circumstances existing in this case.

Nor do I agree that the federal government, making this vicarious effort to protect Hardy from the criminal charges brought by the State of Mississippi against him, is immunized from the direct prohibitions of 28 U.S.C.A. § 2283. The statute states categorically that "A court of the United States may not grant an injunction to stay proceedings in a State court" except in those instances carefully spelled out in the residue of the statute. What the government seeks to do here does not come within the purview of any of those exceptions, and the attenuated argument of the majority to the contrary is to me wholly unconvincing. Without pausing to follow this portion of the majority opinion further, I refer to

---

[1.] An urgency springing from the self-imposed delay of the government in beginning this action. The prosecution was instituted against Hardy in the state courts of Walthall County, Mississippi on September 7, 1961. The United States chose not to file its complaint in the present action until September 20, 1961, when it prayed for an immediate restraining order. The court below required notice to the defendants and heard and denied the motion at 5:00 P.M. September ber 21, 1961. As stated in the majority opinion, its author was importuned in his home at 10:30 P.M. on September 21st, 1961, for a stay of the proceedings before us. The clerk of the District Court was required to rush the filing of the record and appellee was called upon to file a brief, all in the course of twelve days. The whole procedure was in keeping with the government's practice of demanding, and most often receiving, special treatment.

the discussion of a like question which Judge Mize, United States District Judge, Southern District of Mississippi, so ably made in his decision in the case of the Application of Wyckoff, D.C.S.D.Miss., 196 F.Supp. 515, 518 et seq. I further adopt the reasoning of that decision and the authorities there cited to supplement what is here written.

I cannot refrain from saying a word in defense of Mr. Chief Justice Stone's landmark opinion on federal-state relationships in Douglas et al. v. City of Jeannette et al., 1943, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324. The attitude of the majority would, it seems to me, if followed, deal a crippling blow to this most important aspect of those vital relationships which constitute the bedrock of the Constitution of the United States. The majority devotes nearly ten pages of its opinion to a discussion of "the strictures of Douglas v. [City of] Jeannette." Its efforts to water down Jeannette and the manifold application of its teachings to the basic relationships of our dual sovereignty, conclude with a firm reliance upon the decision of this Court in Morrison v. Davis, 5 Cir., 1958, 252 F.2d 102, 103, certiorari denied 356 U.S. 968, 78 S.Ct. 1008, 2 L.Ed.2d 1075, wherein this Court said: "To the extent that this [Browder v. Gayle] is inconsistent with Douglas v. City of Jeannette, Pa., 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324, we must consider the earlier case modified."

I think the position that Jeannette has been modified is wholly without authoritative support. Shepard's Citations show that the case has been cited one hundred forty times and, until the majority opinion here, its binding force had been questioned only in Morrison v. Davis, supra. What has happened since Morrison v. Davis rejects totally, in my opinion, the conclusion that Jeannette has been modified.

Until the present, Morrison v. Davis had been cited only once by an appellate

federal court. A month after its rendition, it was referred to without approval by the Sixth Circuit in its decision of Fuqua et al. v. United Steelworkers, etc., 6 Cir., 1958, 253 F.2d 594, 598, in an opinion written by Judge (now Mr. Justice) Stewart, where it was said (at page 597):

"A thorough discussion of these standards and of the important policy considerations which underlie them is found in Douglas v. City of Jeannette, 1943, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324. * * *

"As there pointed out, federal courts of equity should conform to clearly defined Congressional policy, ' * * * by refusing to interfere with or embarrass threatened proceedings in state courts save in those exceptional cases which call for the interposition of a court of equity to prevent irreparable injury which is clear and imminent. * * *

" 'It is a familiar rule that courts of equity do not ordinarily restrain criminal prosecutions. *No person is immune from prosecution in good faith for his alleged criminal acts. Its imminence, even though alleged to be in violation of constitutional guaranties, is not a ground for equity relief* since the lawfulness or constitutionality of the statute or ordinance on which the prosecution is based may be determined as readily in the criminal case as in a suit for an injunction. * * * Where the threatened prosecution is by state officers for alleged violations of a state law, the state courts are the final arbiters of its meaning and application, subject only to review by [the Supreme] Court on federal grounds appropriately asserted. * * * ' "[2] [Emphasis added.]

As Judge Mize pointed out in his decision of In re Wyckoff, D.C., 196 F.Supp. 515, 518 et seq., supra, it appears that

2. The quoted language is of interest also in connection with what was said in *Morrison v. Davis* (252 F.2d at page 103): "Moreover we think the trial court here properly held: 'It is not the Court's view that in our civilization it is necessary to have incidents requiring arrests to have the rights of people declared.' "

the Supreme Court itself has cited Jeannette three times since Morrison v. Davis. In Speiser v. Randall, 357 U.S. 513, 78 S.Ct. 1332, 2 L.Ed.2d 1460, Jeannette was cited in a concurring opinion by Mr. Justice Black in support of a point different from that here under consideration. It was used to sustain another point by the majority opinion of the Supreme Court in Monroe v. Pape, 1961, 365 U.S. 167, 171, 81 S.Ct. 473, 5 L.Ed.2d 492, and by the dissent-opinion of Mr. Justice Frankfurter, ib. at page 206 of 365 U.S., at page 492 of 81 S.Ct.

In Wilson v. Schnettler, 1961, 365 U.S. 381, 385, 81 S.Ct. 632, 5 L.Ed.2d 620, Jeannette was cited with approval in the opinion of the court and also by the concurring opinion of Mr. Justice Stewart (at page 388 of 365 U.S., at page 637 of 81 S.Ct.). The court there affirmed the action of the Court of Appeals of the Seventh Circuit, 1960, 275 F.2d 932, which had followed Jeannette as controlling authority. In that case, concurred in by all of the Justices save three, the Supreme Court paraphrases the language of Jeannette, adhering, as of February 27, 1961, to principles which the majority here reject (365 U.S. at page 385, 81 S. Ct. at page 635):

"There is still another cardinal reason why it was proper for the District Court to dismiss the complaint *We live in the jurisdiction of two sovereignties. Each has its own system of courts to interpret and enforce its laws, although in common territory. These courts could not perform their respective functions without embarrassing conflicts unless rules were adopted to avoid them. Such rules have been adopted.* One of them is that an accused 'should not be permitted to use the machinery of one sovereignty to obstruct his trial in the courts of the other, unless the necessary operation of such machinery prevents his having a fair trial.' Ponzi v. Fessenden, 258 U.S. 254, 259 [42 S.Ct. 309, 66 L. Ed. 607]. Another is that federal courts should not exercise their discretionary power 'to interfere with or embarrass threatened proceedings in state courts save in those exceptional cases which call for the interposition of a court of equity to prevent irreparable injury which is both clear and imminent * * *.' Douglas v. City of Jeannette, supra, [319 U.S.] at [page] 163 [63 S.Ct. at page 881]." [Emphasis added.]

The language emphasized in the above quotation, as well as in the last quotation from Jeannette (in Fuqua, supra) is extremely hard for the Judges who are bent upon the exaltation of federal sovereignty, the debasement of state sovereignty, to accept.

In Pugach v. Dollinger, 277 F.2d 739, the Court of Appeals for the Second Circuit affirmed the action of a district judge who had refused to grant injunctive relief against a state criminal prosecution. The Court of Appeals based its affirmance on Jeannette. The Supreme Court affirmed in a per curiam opinion in Pugach v. Dollinger, 1961, 365 U.S. 458, 81 S.Ct. 650, 5 L.Ed.2d 678, basing its affirmance, however, upon the authority of Schwartz v. State of Texas, 344 U.S. 199, 73 S.Ct. 232, 97 L.Ed. 231, and Stefanelli v. Minard, 342 U.S. 117, 72 S.Ct. 118, 96 L.Ed. 138, two decisions in the long line which have upheld without deviation the principles of Jeannette which the majority declines to follow here.

The majority opinion makes a detailed recital of actions by the public officials of the State of Mississippi and Walthall County, which depicts these officials as wholly unworthy of trust, although they had been elected to their positions by the people of their counties or districts. This detailed recital goes, in my opinion, beyond what was necessary to a decision of the legal points presented by this appeal. The "strictures" were based largely upon statements made by a person of palpable irresponsibility who had come from a distant point into the State of Mississippi to stir up distrust between the races.

In the public press (The Tylertown Times of September 7, 1961) the editor of a newspaper stated:

"In our interview, Hardy expressed skepticism to me about the existence of God. He said 'Why should I believe in a God that I can't see?' He told me he did not believe in service in the armed forces. 'Why should I go to defend a lie?', he said."

The same statement appears in a number of affidavits the originals of which are attached to the brief of appellees. Appellee's brief states: "It was agreed at this time, [that is, when the application of appellant for injunction pending appeal was presented to Judge Rives] that the appellees may file and make parts of their briefs as part of the record any affidavits which they so desired."

Appellee's brief further showed that all of the original affidavits filed had been served on the appellant within the time fixed by Judge Rives at that hearing. As far as I am advised, the appellant has never moved to strike the affidavits, or taken any other step to take them out of the record. Such an attitude would appear to be requisite in view of the fact that the government had not given the county and state officers an opportunity to file affidavits prior to the hearing before the court below.

It is to me a saddening spectacle to witness the publishing of decisions such as that of the majority here, which can have no other effect than to cause the people of the southland to look upon federal functionaries pursuing the course here presented to us, as "alien intruders." [3] I am constrained to repeat here words which I used in my recent dissenting opinion in Boman v. Birmingham Transit Co., 5 Cir., 292 F.2d 4, 28–29:

"It is the universal conviction of the people of the [South] also that the judges who function in this circuit should render justice in individual cases against a background of, and as interpreters of, the ethos of the people whose servants they are. This is the genius of the judicial system established by Congress and as traditionally administered by those who select the judges—a process, incidentally, which all know follows normal political lines. The statutes creating the United States Courts of Appeal require that only citizens who are residents of the respective circuits at the time shall be eligible for appointment, and that they shall continue to reside in the circuit during their term of office (28 U.S.C.A. § 44 (c)). For decades, in this circuit, judges have been selected so that each state in the circuit shall be fairly represented on the court.

"It is the firm conviction of the [people of the South] also that decisions such as this one, in cases brought by or on behalf of Negroes and involving the equal protection clause of the Fourteenth Amendment, have not been in harmony with the spirit, thought and desires of the people, the vast majority of whom, in both races, know that their common problems can best be worked out if they are left alone to continue the unbroken improvement in relationships which has taken place in the last eight decades. They are keenly conscious of the fact that since the end of the tragic era following the War Between the States and in spite of the handicaps born of it, there has been a continuing growth in mutual understanding, respect and brotherhood between the members of the two races; and that the progress made by the Negroes in advancement educationally, socially, economically and in all other phases of their lives has exceeded that achieved by them anywhere else in any country at any time. That a breach in these relationships, achieved in the close and compassionate contacts which have taken place under such trying conditions should be permitted to occur is unthinkable to practically all of the people of good will of both races.

3. The language is that of the Supreme Court in Hecht v. Bowles, 1944, 321 U.S. 321, 329–330, 65 S.Ct. 587, 88 L.Ed. 754.

"The rank and file of Negroes, realizing the hardship under which they labor by reason of the headstart of several centuries enjoyed by white people, and proud of their race and its accomplishments, resent the efforts of the agitators who do not understand, to [throw into the courts matters of status and relationships which can best be worked out in the friendly atmosphere of close community contacts]. They feel, in common with their white neighbors, that the judges should perform their duties with a sympathetic understanding of the true facts; and further that such an understanding has been tragically lacking in many of the decisions of many of the Judges in the Fifth Circuit whose actions have gone so far to the other extreme that Time Magazine gave six of the Judges an enthusiastic write-up with photographs in its issue of December 5, 1960, page 14. The article, encircled in red for emphasis, was headed 'Trail-Blazers on the Bench —South's U. S. Judges Lead a Civil Rights Offensive.' It stated that the Judges extolled constituted 'an honor roll without precedent in United States legal annals' and that they had 'collectively * * * launched one of the great, orderly offensives of legal history.' "

This is not the time, in my opinion, for outsiders, unfamiliar with the intricate problems involved, to set neighbor against neighbor—to adopt a course which will ultimately lead to the destruction of the tolerance and understanding so necessary to the continued advancement of the interests of both races. At a time when the daily press is filled with stories of racial strife from every quarter of the globe, men of good will in this nation ought, in my judgment, to be thankful that the two races in the South have, for more than a half century, avoided such strife and have advanced together in a spirit of brotherhood with a speed which those who take the trouble to learn the facts think is phenomenal. It is un-

thinkable that a handful of agitators, however sincere their motives may be, would be permitted to interrupt that advance and set the stage for another "Tragic Era."

I respectfully dissent.