**UNITED STATES of America, Appellant,**

v.

**LEFLORE COUNTY, a political subdivision of the State of Mississippi et al., Appellees.**

**No. 23243.**

United States Court of Appeals Fifth Circuit.

Jan. 3, 1967.

Louis M. Kauder, Atty., Dept. of Justice, Washington, D. C., H. M. Ray, U. S. Atty., Oxford, Miss., John Doar, Asst. Atty. Gen., David L. Norman, Attys., Dept. of Justice, Washington, D. C., for appellant.

John L. Fraiser, Jr., Greenwood, Miss., R. C. McBee, Greenwood, Miss., Peter M. Stockett, Jr., Asst. Atty. Gen., of Miss., Joe T. Patterson, Atty. Gen., of Mississippi, Bell & McBee, Greenwood, Miss., for appellees.

Before THORNBERRY and COLEMAN, Circuit Judges, and YOUNG, District Judge.

THORNBERRY, Circuit Judge:

This action was filed by the United States pursuant to 42 U.S.C. § 1971(b), seeking to enjoin defendants, various public officials of Leflore County, Mississippi, from interfering with the rights of Negro citizens of that county to engage in voter registration activities and to register to vote. Further injunctive relief is sought against the prosecution and incarceration of certain Negro citizens resulting from the events outlined below.

On June 18, 1963, a meeting was held in a Negro church in Itta Bena, Mississippi, in connection with a voter regis- tration drive sponsored by the Student Non-violent Coordinating Committee. Similar meetings had been held nightly for several weeks.[1] During the June 18 meeting, the throats and eyes of several participants became irritated, leading those present to believe that a tear gas bomb had been tossed into the church. Evacuation of the church ensued.[2] At this time, members of the group sought out the local night watchman and requested police protection. They were told that there was no apparent danger, but that if the need arose, protection was available. There is testimony that the group then attempted to reenter the church, but that the irritating fumes were too strong.

A decision was then made that the entire group would march to the home of defendant Weber, the town marshal and county deputy sheriff, to ask for protection. The time was between 10:00 and 11:00 p. m. and the distance to be marched was approximately one mile through the business and residential sections of Itta Bena. It would appear that the group proceeded in an orderly manner, two abreast along the shoulder of the highway.

When the march had nearly reached defendant Weber's home, a disturbance broke out, including the throwing of bottles and bricks. Several marchers testified in the court below that other Negroes threw at the marchers from an alley and that the marchers did not retaliate. There is no direct evidence of any specific marcher throwing bottles or bricks, although such objects were seen in the marchers' possession. Aside from the throwing, the commotion also included, according to several observers, loud shouting, singing about freedom, and running about. The size of the group was estimated at between 75–100 persons.

Defendant Weber testified that he was awakened by his wife and informed of the

---

1. On one previous occasion a "smoke bomb" had reportedly been thrown into the church, and such incident had been investigated by local authorities.

2. The group was also apprehensive because of rumors, held by the district court to be unfounded, that the roads around the church were being blocked.

disturbance, at which time he dressed and went outside. There is conflicting testimony in the record as to what then transpired. Weber, and several deputies who had come on the scene, testified that Weber told the marchers to go home two or three times and also inquired into their purposes before arresting them. Several marchers testified that Weber, upon arriving on the scene, immediately cursed them and placed them all under arrest. Following arrest, the entire group was marched to the Itta Bena jail, and a few hours later was taken to the Leflore County jail in Greenwood.

The next day the group was returned to Itta Bena to be tried by the local justice of the peace under Miss. Code § 2089.5 [3] for breach of the peace. (All marchers under 15 years of age had been released). The marchers were tried in three groups of twelve and one group of nine. They were not represented by counsel. Several of the present appellees, however, testified that each group was informed of its legal rights. Testimony of the marchers in this respect is conflicting, as some claim they were not so informed. Following a proceeding lasting slightly over one hour, all of the marchers were found guilty. Each male marcher was fined $500 and sentenced to six months in jail, whereas the women were fined $200 and sentenced to four months. Bond was set at $750 and $500, respectively, for each member of the two groups.

All of the convicted marchers later received a trial *de novo* in the County Court. All 45 were again convicted and given $500 fines and six-month sentences, three months of which were suspended. The Circuit Court of Leflore County upheld the convictions and an appeal was taken to the Mississippi Supreme Court. That appeal was subsequently dismissed for failure to timely perfect.

The district court heard evidence on July 11, 12 and 19, 1963, on the Government's motion for a preliminary injunction filed with the main suit. This motion was denied on July 22, 1963. The Government noted an appeal from this order and moved in this Court for an injunction pending appeal. This motion was denied, but this Court agreed to expedite its consideration of the case. Upon the Government's own motion, the appeal was later dismissed and the case returned to the district court for a hearing on the merits. Since the relevant facts were before the district court from the testimony at the hearing on the motion for preliminary injunction, it was stipulated that the ultimate question of whether a permanent injunction should issue could be decided on the existing record. The district court denied the permanent injunction, dismissed the complaint, and the Government appealed. We affirm.

42 U.S.C. § 1971(b) provides in pertinent part:

No person, whether acting under color of law or otherwise, shall intimidate, threaten, coerce, or attempt to intimidate, threaten, or coerce any other person for the purpose of interfering with the right of such other person to vote * * *.

Subsections (c) and (d) of Section 1971 then provide that the Attorney General of the United States may seek an injunction or other civil relief to enforce the provisions of subsection (b). Suc-

3. Miss. Code Ann. § 2089.5 (Supp.1964) reads:
    Any person who disturbs the public peace, or the peace of others, by violent, or loud, or insulting, or profane, or indecent, or offensive, or boisterous conduct or language, or by intimidation, or seeking to intimidate any other person or persons, or by conduct either calculated to provoke a breach of the peace, or by conduct which may lead to a breach of the peace, or by any other act, shall be guilty of a misdemeanor, and upon conviction thereof, shall be punished by a fine of not more than five hundred dollars ($500.00), or by imprisonment in the county jail not more than six (6) months, or both.

cessful implementation of § 1971(b) requires:

> * * * proof of two ultimate facts: (1) that there was an intimidation, threat, or coercion, or an attempt to intimidate, threaten, or coerce, and (2) that the intimidation was *for the purpose of interfering with the right to vote.* (Emphasis added).

United States v. Board of Education, 5th Cir. 1964, 332 F.2d 40, 46 (Rives, J. concurring). In its memorandum opinion filed in support of denial of relief, the district court expressly found against the Government with respect to both of the above ultimate facts.

■ The alleged acts of intimidation in the instant case were the arrest and conviction in the justice court of the forty-five adult marchers. The district court felt that there was no overt evidence of actual intimidation and that the Negro voter registration drive did not falter subsequent to the events complained of. The Government argues, however, that the arrests and prosecutions were by their very nature coercive and require a finding of intimidation. An attempt to show actual intimidation in this manner does not, in our minds, aid the Government's case. Clearly, the state and its subdivisions may reasonably enforce their criminal laws. Often such valid enforcement may incidentally have an inhibiting or intimidating effect upon the exercise of a protected right. Yet, the unfortunate incidental effect may not be grounds for setting aside or enjoining the otherwise justifiable enforcement of the valid criminal law.

■ Thus, the Government's appeal, in essence, boils down to an attack upon the district court's finding that the actions of defendants were not motivated by a purpose to constrain the voting rights of the marchers and other Negro citizens of Leflore County. Only if such

a purpose existed can defendants' actions constitute an attempt to intimidate or coerce in violation of § 1971(b).[4] In its attempt to gain reversal of the district court's finding that no such purpose was established, the Government asserts that when dealing with questions of "motive" and "purpose," the "clearly erroneous" standard of review of Rule 52(a) Fed.R. Civ.P. should not be strictly applied. This position is without merit and has been refuted by this Court on several occasions in cases brought under § 1971(b). In United States v. Board of Education, 5th Cir. 1964, 332 F.2d 40, the court stated:

> * * * It is insisted that the standard of review to be applied when *purpose* is in issue is "to study the case as a whole, weighing all of the evidence and rational inferences in order to reach a net result." * * *

The clearly erroneous rule is so well established in federal jurisprudence that citation of authority is unnecessary. We are bound by Rule 52(a) Fed.R.Civ.P. On appeal our decision is not reached by weighing the evidence to determine on which side of the lawsuit there is a preponderance of evidence. The fact that "intent" or "purpose" was an issue in the Trial Court does not change the rule. The determination of design, motive, purpose, or intent is also dependent upon the testimony produced at the trial, and the credit which the trier of the facts gives to the witnesses who appear and testify *ore tenus* before the Court. Findings as to intent, motive, purpose, or design are not to be tried *de novo,* but such findings are to be reviewed by the same standards applied in reviewing other facts.

Id. at 44–45. United States v. Edwards, 5th Cir. 1964, 333 F.2d 575, states the same rule. Thus the court's finding of

---

4. We express here no view as to whether the burden placed upon the Government would differ, and if so in what respects, under § 11 of the Voting Rights Act of 1965, 79 Stat. 443, 42 U.S.C.A. § 1973i (Supp.1965). See Hearings Before Subcommittee No. 5 of the House Committee on the Judiciary on Voting Rights, 89th Cong., 1st Sess., on H.R. 6400 at 11; part 2 at 948–49.

no illegal motive must be reviewed in light of the clearly erroneous standard.[5]

In arguing that the facts clearly show a purpose to intimidate, the Government asserts that the march itself was a justified adjunct to voter registration activities. This itself is open to grave doubt. The march was allegedly caused by a tear gas attack upon the church meeting and a rumored blocking of the roads. The district court determined that the fear of road blocks was "unfounded" and nowhere in the record is there evidence contrary to such finding. Furthermore, testimony relating to the alleged attack with tear gas upon the meeting was placed in serious doubt, although not directly controverted, by testimony of an FBI agent and a local teacher experienced in matters of chemical warfare. These men visited the church shortly after the alleged bombing, and found "no trace" of tear gas or other noxious substance. Furthermore, they testified that evidence of tear gas in such a confined space would linger for days. In questioning the marchers concerning the origin and reasons for the march, the district court attempted to determine why the group did not send a representative or a small group to seek the sheriff's aid. None of the marchers questioned could explain why this approach was not taken. Thus the record lends strong support to the view of the district court that the march itself was not caused by a compelling need for protection, nor did it constitute a reasonable exercise of voter registration activity.

■■ The Government next attempts to show that the legal action taken against the marchers was not justifiable on legitimate law enforcement grounds. The evidence as to the exact happenings at the place of riot is confused and conflicting. It would appear that the marchers were attacked by other persons, and there is no direct evidence that the marchers retaliated. Because of this fact, the trial court's statement that "some [bricks and bottles] were thrown at automobiles by members of the marching group" may well be clearly erroneous. However, this would not mean that the district court's ultimate finding that the arrest of the marchers was justified was also clearly erroneous. The breach of the peace statute seeks to curb conduct of a broader scope than the throwing of bricks and bottles.[6] The statute clearly

---

5. The ramifications of application of this standard have been adequately summarized in a recent opinion of this Court:
"The attack on the Court's findings of fact is the not unnatural one that the Trial Judge ought not to have found as he did. But this misconceives our function. We do not retry the case. * * * We may determine only whether the findings pass muster under the clearly erroneous concept of F.R.Civ.P. 52(a), 28 U.S.C.A. The burden of upsetting these findings is indeed formidable here since the witnesses were all heard and seen by the Judge in open court and the crucial issues of motive and purpose involved credibility choices of the most elemental nature." A finding is clearly erroneous, when although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. Where the evidence would support a conclusion either way, a choice by the trial judge between two permissible views of the weight of evidence is not clearly erroneous, and the

fact that the judge totally rejected an opposed view impeaches neither his impartiality nor the propriety of his conclusions."
Chaney v. City of Galveston, 5th Cir. 1966, 368 F.2d 774, at 776 (Citations and footnotes omitted).

6. In arguing that the conduct of the marchers did not justify the legal action taken, the Government would view the Mississippi breach of the peace statute very narrowly. This is shown by the following footnote from the Government's brief:
"The throwing of bottles is the only plausible criminal charge that could grow out of the facts shown in this record. There was no traffic to be obstructed and the Negroes in fact were formed in a column to the side of the street until attacked by the bottle-throwers."
Footnote 30, appellant's brief, p. 55. By this interpretation, the Government attempts to play down the evidence which tends to justify the arrests under the broad terms of the statute.

prohibits any loud, violent or boisterous conduct which may disturb or lead to disturbances of the public peace. The record includes evidence that the marchers were shouting loudly and running about. The district court also felt that the hour of the night and the size of the group were circumstances tending to support the arrest. Even assuming that the marchers were entirely orderly until attacked, a group of approximately 80 persons proceeding through the residential and business sections of a small rural town late at night in and of itself raises strong apprehension of possible trouble. These circumstances, coupled with the substantial disturbances that did indeed take place, support the district court's conclusion that the arrest of the marchers was justified.[7]

Appellant urges, however, that the method of arrest, the brevity of the trial in the justice court, and the severity of the sentences belies the true purpose of defendants' conduct—a desire to stifle the Negro incentive to exercise the voting franchise. Although we feel that the facts of this case may have justified the district court in drawing the inference urged by the Government, the failure to do so was not clearly erroneous.[8]

Surrounding circumstances also lend support to the district court's finding of no illegal motive. As stated earlier, similar voter registration meetings had been held nightly for several weeks. This fact was known throughout the community. The town authorities had cooperated to the extent of putting down shell in parking areas around the church to help accommodate the unusually heavy use. Local peace officers appear to have made a conscientious effort to maintain peace and to protect the church. Furthermore, no marcher questioned by the court below was able to state that he had personally been intimidated by any of the defendants. No evidence appears in the record which would indicate any effort by defendants to interfere with the actual registration process. This fact further dilutes the force of the inference the Government would draw from the conduct here involved.[9]

Having viewed the entire record, it must still be said that overt facts do not always fully describe the realities of a situation. We acknowledge room for the argument that the facts and circumstances here present could have supported a finding of purposeful intimidation. However, the contrary findings made by the district court are supported by credible evidence and are not clearly erroneous.

Because of our views expressed above, the other contentions raised by the Government need not be considered.

Affirmed.

---

7. It is significant to note that almost all cases in which injunctive relief has been sought under § 1971(b), the conduct leading to the litigation and the conduct sought to be enjoined has been of such a nature that it could in no way be reasonably justified. Illustrative of this fact is United States v. Wood, 5th Cir. 1961, 295 F.2d 772. In that case, Hardy, a voter registration worker, was pistol-whipped by the registrar when he tried to assist local Negroes to register. He was later arrested by the sheriff for breach of the peace. The coercive effect upon voting rights was further demonstrated in *Wood* by the fact that no Negroes attempted to register following this outrageous attack. See also United States v. Edwards, 5th Cir. 1964, 333 F.2d 575; United States v. Beaty, 6th Cir. 1961, 288 F.2d 653.

8. The prosecution and severity of sentence might strongly indicate feelings of racial prejudice. However, any inclination of this Court to infer racial motivation is not, by itself, grounds for injunctive relief under § 1971(b). That section protects against a purpose to affect the right to vote, not a purpose to discriminate generally for reasons of race.

9. We of course, are not saying here that conduct unrelated to actual voting or registration procedures may not violate § 1971(b) or the new provision, § 1973i. Clearly it can. See United States v. Bruce, 5th Cir. 1965, 353 F.2d 474; United States v. Beaty, 6th Cir. 1961, 288 F.2d 653.